Slip Op. 16-70

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **GRK CANADA, LTD.,** | |
| **Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Court No. 09-00390** |
| **Defendant.** | |

## <u>OPINION</u>

[Granting Plaintiff's motion for summary judgment and denying Defendant's motion for summary judgment.]

Dated: July 15, 2016

<u>Craig E. Ziegler</u>, Montgomery, McCracken, Walker & Rhoads, LLP, of Philadelphia, PA, for plaintiff.

<u>Jason Matthew Kenner</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for defendant.  With him on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Amy M. Rubin</u>, Assistant Director, International Trade Field Office.  Of Counsel on the brief was <u>Beth Brotman</u>, Office of the Assistant Chief Counsel International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Kelly, Judge:  Before the court are cross-motions for summary judgment regarding

the proper classification of imports of certain steel screw fasteners.  <u>See</u> Def.'s Mot.

Summ. J., Feb. 29, 2016, ECF No. 65; Mot. Summ. J. Pl. GRK Canada, Ltd., Feb. 29,

2016, ECF No. 68.  Defendant maintains United States Customs and Border Protection

("Customs") properly classified GRK Canada, Ltd.'s ("GRK") entries of steel screw

fasteners under Harmonized Tariff Schedule of the United States (2007) ("HTSUS")

subheading 7318.12.00, which covers "Other wood screws."  See Def.'s Mem. Supp. Mot. Summ. J., Feb. 29, 2016, ECF No. 65 ("Def. Br.").   Plaintiff argues that Customs improperly denied GRK's protest of Customs' classification of GRK's imported steel screw fasteners and that the merchandise is properly classified under HTSUS subheading 7318.14.10, which covers "Self-tapping screws."  See Br. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd., Feb. 29, 2016, ECF No. 70 ("GRK Br.").

This matter returns to the court following a decision by the United States Court of Appeals for the Federal Circuit, which vacated and remanded the court's earlier decision granting summary judgment in favor of Plaintiff.  See GRK Canada, Ltd v. United States, 37 CIT __, 884 F. Supp. 2d 1340 (2013) ("GRK I"), vacated and remanded, 761 F.3d 1354 (Fed. Cir. 2014) ("GRK II").  The court presumes familiarity with the prior decisions and will only recount the prior proceedings as necessary.

After reviewing the undisputed facts, the court in GRK I undertook an examination of the language of the tariff terms, aided by the Harmonized Commodity Description and Coding System's Explanatory Notes ("Explanatory Notes"), lexicographic sources, industry standards for mechanical fasteners, and expert testimony.  GRK I at __, 884 F. Supp. 2d at 1346–52.  The court identified the competing subheadings as eo nomine provisions and held that the screws imported by GRK were properly classified as self-tapping screws rather than as other wood screws, rejecting any consideration of "use" as informing the meaning of either tariff term.  Id. at __, 884 F. Supp. 2d at 1345, 1352–56. The Court of Appeals vacated and remanded the court's decision in GRK I, holding that it was error for the court to "refuse[] to consider the use of the screws at any step of

determining the classification of the subject articles at issue." GRK II, 761 F.3d at 1355. The Court of Appeals subsequently denied a petition for rehearing en banc. See GRK Canada, Ltd. v. United States, 773 F.3d 1282 (Fed. Cir. 2014) ("GRK III").

Upon remand, the Court of International Trade ordered pretrial discovery in the matter reopened "limited to the issues of 'intended use,' or 'principal use,' or 'actual use' of the imported screws at issue." Scheduling Order, Mar. 31, 2015, ECF No. 59. The parties completed discovery on November 13, 2015, see Order, Aug. 4, 2015, ECF No. 62, and on February 29, 2016 the parties cross-moved for summary judgment. Together with their motions for summary judgment, the parties submitted separate statements of undisputed material facts. See Pl. GRK Canada, Ltd.'s Statement of Undisputed Facts, Feb. 29, 2016, ECF No. 69 ("GRK Facts"); Def.'s Statement of Material Facts Which There Are No Genuine Issues to be Tried, Feb. 29, 2016, ECF No. 67 ("Def. Facts"). Thereafter, the parties submitted responses to the statements of undisputed facts, see Resp. Pl. GRK Canada, Ltd. Def.'s Statement of Undisputed Facts, Apr. 4, 2016, ECF No. 75 ("GRK Facts Resp."); Def.'s Resps. Pl. GRK Canada, Ltd., Rule 56.3 Statement of Material Facts, May 6, 2016, ECF No. 79 ("Def. Facts Resp."). Briefing in the action concluded on May 20, 2016 after the parties submitted responses and replies to the motions for summary judgment. See Br. Pl. GRK Canada, Ltd. Opp'n Government's Mot. Summ. J., Apr. 4, 2016, ECF No. 74 ("GRK Resp."); Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. and Reply Pl.'s Resp. Def.'s Mot. Summ. J., May 6, 2016, ECF No. 78 ("Def. Resp. & Reply"); Reply Br. Pl. GRK Canada, Ltd. Further Supp. Mot. Summ. J., May 20, 2016,

ECF No. 80.  For the reasons set forth below, the court grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment.

## UNDISPUTED FACTS

The following facts are not in dispute.  GRK imported the steel screw fasteners at issue into the United States between January 2008 and August 2008.  GRK Facts ¶¶ 5, 6; Def. Facts Resp. ¶¶ 5, 6.  Customs classified GRK's imported screws under HTSUS subheading 7318.12.00 as "Other wood screws" dutiable at 12.5% ad valorem, and the entries were liquidated by Customs between November 2008 and January 2009.  GRK Facts ¶¶ 7, 14; Def. Facts Resp. ¶¶ 7, 14.  GRK paid all liquidated duties assessed on the merchandise and filed timely protests, all four of which were denied by Customs.  GRK Facts ¶¶ 7–10; Def. Facts Resp. ¶¶ 7–10.

The screw fasteners that are the subject of GRK's protests consist of two models: (1) R4 screws and (2) Trim Head screws.  GRK Facts ¶ 12; Def. Facts Resp. ¶ 12.  GRK's Trim Head Screws are available in two varieties – RT Composite Trim Head ("RT") screws and Fin/Trim Head ("Fin/Trim") screws.  GRK Facts ¶ 13; Def. Facts Resp. ¶ 13.  Each of these screws has a head, is made of steel, and is manufactured in varying lengths and diameters.  GRK Facts ¶ 12; Def. Facts Resp. ¶ 12.  All of GRK's screws are available in heat-treated case-hardened carbon steel, and all of these carbon steel screws are also available with a "Climatek" coating.  Def. Facts ¶¶ 11, 18; GRK Facts Resp. ¶¶ 11, 18; GRK Facts ¶¶ 16–17; Def. Facts Resp. ¶¶ 16–17.  The Climatek coating includes a water-based lubricant intended to reduce the torque required to drive the screw, allowing GRK's case-hardened carbon steel screws to be used in very dense materials.  Def. Facts ¶ 27;

GRK Facts Resp. ¶ 27; GRK Facts ¶ 62; Def. Facts Resp. ¶ 62.  The color of the Climatek coating matches almost all wood finishes.   Def. Facts ¶ 28;  GRK Facts Resp. ¶ 28. Certain sizes of GRK's screws are also available in stainless steel.  Def. Facts ¶¶ 12, 19, 29; GRK Facts Resp. ¶¶ 12, 19, 29; GRK Facts ¶ 16; Def. Facts Resp. ¶ 16.  "Stainless steel is a harder material than non-case-hardened carbon steel."  GRK Facts ¶ 19; Def. Facts Resp. ¶ 19.

The screws at issue are manufactured to meet minimum torsional strength requirements,[1] which require a harder screw than screws that do not meet such torsional requirements.  GRK Facts ¶¶ 22, 24; Def. Facts Resp. ¶¶ 22, 24.  The screws can be used to penetrate materials such as "sheet metal, plastics, medium-density fiberboard, polyvinyl chloride (PVC) board, cement fiberboard, melamine, arborite, and other man-made composite materials."  GRK Facts ¶ 30; Def. Facts Resp. ¶ 30.  GRK's screws are used to mate dissimilar materials, such as plastics or dense composite materials to wood. GRK Facts ¶ 31; Def. Facts Resp. ¶ 31.  GRK's screws, at least in some applications, are able to pierce the material without the need to pre-drill a bore hole.  GRK Facts ¶ 30; Def. Facts Resp. ¶ 30.

---

[1] Pursuant to industry standards, the minimum strength requirement for a tapping screw is 4 pound-inches ("lb-in.") for a 2 inch screw, 9 lb-in. for a 3 inch screw, 12 lb-in. for a 4 inch screw, etc.  See Thread Forming and Thread Cutting Tapping Screws and Metallic Drive Screws (Inch Series) ASME B18.6.4-1998 at Table 4.   Neither party specifies the minimum strength requirement for GRK's screws or quantifies the torsional strength of GRK's screws.

The screws at issue all have gimlet points with a point angle of between 25 and 35 degrees.[2]  GRK Facts ¶ 25; Def. Facts Resp. ¶ 25.  Some of GRK's screws have a Type 17 point that GRK calls a "Zip-tip."   GRK Facts ¶ 27; Def. Facts ¶¶ 6, 14; GRK Facts Resp. ¶¶ 6, 14.  All RT and Fin/Trim screws have a Type 17 point and R4 screws that are 1¼ inches and longer have a Type 17 point.  Def. Facts ¶¶ 6, 14; GRK Facts Resp. ¶¶ 6, 14.  GRK's Type 17 point can be described as

> a gimlet point with a slot or groove with sharp edges cut into the point.  This cut-out groove or slot adds an additional cutting edge to the point, which cuts and removes material that the screw is penetrating.  The presence of this cutting groove allows the screw to get started more easily and reduces the torque needed to drive the screw.

GRK Facts ¶ 28; Def. Facts Resp. ¶ 28.

The Type 17 point gives screws the ability to start quickly in certain materials.  Def. Facts ¶ 20; GRK Facts Resp. ¶ 20.  The American National Standards Institute and the American Society of Mechanical Engineers (collectively "ANSI/ASME") jointly publish industry standards for screw fasteners ("ANSI/ASME Standard"), and the Type 17 point is not listed as a point that is specified for tapping screws.[3]  GRK Facts ¶¶ 38, 42; Def. Facts Resp. ¶¶ 38, 42.

R4 and Trim Head screws that are 1¼ inches and longer also have a patented thread design that is referred to as "W-Cut" threading.  Def. Facts ¶¶ 8, 15; GRK Facts

---

[2] Pursuant to industry standards for mechanical fasteners, a gimlet point is "a threaded cone point usually having a point angle of 45 to 50 [degrees]."  See Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 8 at 5, Feb. 29, 2016, ECF No. 71-7.

[3] The standards published by ANSI/ASME do not cover the entire universe of screws.  See Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 5 at 31–32, Feb. 29, 2016, ECF No. 71-5.  These standards are reactive documents in that the standards respond to specific inquiries from members in the industry.  Id.

Resp. ¶¶ 8, 15.  The W-Cut threading acts as a sawblade and easily cuts through a variety of materials.  Def. Facts ¶ 21; GRK Facts Resp. ¶ 21.

All R4 screws have a "self-countersinking" head with saw-blade-like-cutting teeth and six self-contained cutting pockets, which allow the screw to be installed flush with the surface without a separate countersinking operation.[4]  Def. Facts ¶¶ 10, 23; GRK Facts Resp. ¶¶ 10, 23.  This self-countersinking head is designed to penetrate hard, brittle, or thin plasticized surfaces veneered onto lumber or composite woods without causing the surface of the material to crack, tear, or "mushroom," i.e., when material displaced by a screw rises to the surface and creates a bubble.  Def. Facts ¶ 24; GRK Facts Resp. ¶ 24; GRK Facts ¶ 63; Def. Facts Resp. ¶ 63.  In addition to the W-Cut threading discussed above, R4 screws that are 2 inches and longer have a secondary "CEE" threading.  Def. Facts ¶ 9; GRK Facts Resp. ¶ 9.  The CEE threading enlarges a screw hole to allow the affixed materials to settle against each other easily around the non-threaded portion of the screw.  Def. Facts ¶ 22; GRK Facts Resp. ¶ 22.  "The R4 is recommended for use in wood, particle board, plastic, sheet metal, cement fiberboard and wood decking, pressure treated lumber decking, cedar and redwood decking."  Def. Facts ¶ 31; GRK Facts Resp. ¶ 31.  The R4 can be used in woodworking and other applications and is designed to affix thin metal to wood.  Def. Facts ¶¶ 30, 32; GRK Facts Resp. ¶¶ 30, 32.

---

[4] Plaintiff's expert, Dr. David R. Bohnhoff, describes countersinking as an operation "used to flare out the top of the hole" so that the screw head can "become flush with the surface after installation."  See Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 8 at 9–10, Feb. 29, 2016, ECF No. 71-76.

RT and Fin/Trim screws are designed to have the "smallest screw head available." Def. Facts ¶ 17; GRK Facts Resp. ¶ 17.  The small head of these screws is designed to prevent the screws from cracking the material that the screw is driven into.  Def. Facts. ¶ 26; GRK Facts Resp. ¶ 26.  The RT screw has "reverse threading" as its secondary threading.  Def. Facts ¶ 16; GRK Facts Resp. ¶ 16.  The reverse threading allows the head of the RT screw to be less noticeable when used in certain materials and is designed to avoid the problem of mushrooming by pulling any excess material cut away by the screw back into the screw hole.  Def. Facts ¶ 25; GRK Facts Resp. ¶ 25; GRK Facts ¶ 63; Def. Facts Resp. ¶ 63.  Fin/Trim screws do not have secondary threading.  Both the RT and Fin/Trim screws are used for most fine carpentry applications and trim applications.  Def. Facts ¶ 34; GRK Facts Resp. ¶ 34.  The RT and Fin/Trim screws also can be used to anchor composite decking to wood beams.  Def. Facts ¶ 35; GRK Facts Resp. ¶ 35.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2006)[5] and 19 U.S.C. § 1515 (2006), which grant the court authority to review actions contesting the denial of a protest regarding the classification of imported merchandise, and the court reviews such actions de novo.  28 U.S.C. § 2640(a)(1).  Determining the correct classification of merchandise involves two steps.  First, the court determines the proper meaning of the tariff provisions, a question of law.  See Link Snacks, Inc. v. United States, 742 F.3d 962, 965 (Fed. Cir. 2014).  Second, the court determines whether the subject merchandise

---

[5] Further citations to Title 28 of the U.S. Code are to the 2006 edition.

properly falls within the scope of the tariff provisions, a question of fact.  Id.  The court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).

In order to raise a genuine issue of material fact, it is insufficient for a party to rest upon mere allegations or denials, but rather that party must point to sufficient supporting evidence for the claimed factual dispute to require resolution of the differing versions of the truth at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986); Processed Plastics Co. v. United States, 473 F.3d 1164, 1170 (Fed. Cir. 2006); Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 835-36 (Fed. Cir. 1984).  Where no genuine "dispute as to the nature of the merchandise [exists], then the two-step classification analysis collapses entirely into a question of law."  Link Snacks, 742 F.3d at 965–66 (citation omitted).  The court must determine "whether the government's classification is correct, both independently and in comparison with the importer's alternative."  Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).

## DISCUSSION

### I.  The Purpose of "Use" in Defining the Meaning of a Tariff Term

The Court of Appeals vacated and remanded the court's decision in GRK I for the court to consider use and determine how use affects the meaning of the tariff terms and

the classification of the merchandise at issue in this case.[6]  GRK II, 761 F.3d at 1355.

The Court of Appeals did not instruct the court as to how use affects the meaning of a

tariff term, but its opinion raises two possibilities.  The Court of Appeals suggests either

the provision may be controlled by use, or the physical characteristics of the putative tariff

terms may overlap to the extent that it would be error not to consider the intended use

implicated by each term in deciding between the possible classifications.  GRK II, 761

F.3d at 1359.

    First, a tariff term written as an eo nomine provision may be controlled by use and,

if so, the court should declare as such.[7]  Id. at 1358–59.  The Court of Appeals stated that

---

[6] The Court of Appeals has left it to this court to determine how use should be considered in determining the meaning and scope of the tariff subheadings.  See GRK III, 773 F.3d at 1286 (Wallach, J., dissenting) (noting that GRK II "offers no answer, as a matter of law, on [the] proper construction [of the competing subheadings], other than the use of the subject merchandise involved in this case should have a bearing on the legal construction of the subheadings.").  There are two distinct inquiries that implicate use: (i) use as it may inform the meaning of the tariff term, and (ii) use to which the merchandise at issue is put.  The former is a question of law and the latter is a question of fact. The Court of Appeals specifically references both of these inquiries admonishing the court not to ignore use in analyzing either inquiry, "whether defining the legal meaning of the tariff terms at issue or determining the proper classification of the subject articles." GRK II, 761 F.3d at 1361.

[7] Provisions controlled by use can be either actual use or principal use provisions.  Actual use provisions, which are rare in the HTSUS, are those in which classification is dependent upon the merchandise's actual use.  Additional Rule of Interpretation ("ARI") 1(b) provides that the "tariff classification is controlled by the actual use to which the imported goods are put in the United States."  ARI 1(b).  Inclusion of the words "to be used for" in the additional notes to the HTSUS indicates that the classification is an actual use provision.  See Clarendon Mktg., Inc. v. United States, 144 F.3d 1464, 1467 (Fed. Cir. 1998).

    "'Principal use' is defined as the use 'which exceeds any other single use of the article.'" Minnetonka Brands, 24 CIT at 650, 110 F. Supp. 2d at 1027 (quoting Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report, USITC Pub. 1400 at 34–35 (June 1983)).  Principal use provisions classify merchandise according to the ordinary use of a particular class of merchandise in the

(footnote continued)

there may be cases when the goods named and described under an eo nomine provision

"'inherently suggest[s] a type of use.'" Id. at 1359 (quoting Carl Zeiss, Inc. v. United

States, 195 F.3d 1375 (Fed. Cir. 1999)).   The Court further clarified that in such a

circumstance the "[c]lassification of subject articles may then need to reach the Additional

Rules of Interpretation ("ARI"), which distinguish the treatment of articles based on

whether tariff classifications are controlled by principal or actual use."[8]  GRK II, 761 F.3d

at 1359 n.2 (citing Primal Lite, Inc. v. United States, 182 F.3d 1362, 1363 (Fed. Cir. 1999);

StoreWALL, LLC v. United States, 644 F.3d 1358, 1365–67 (Fed. Cir. 2011) (Dyk, J.,

concurring) (discussing Processed Plastics, 473 F.3d at 1169–70 (Fed. Cir. 2006);

Orlando Food Corp. v. United States, 140 F.3d 1437, 1441 (Fed. Cir. 1998; Minnetonka

---

United States.  See Primal Lite v. United States, 182 F.3d 1362, 1364 (Fed. Cir. 1999) (citing ARI 1(a)).  ARI 1 provides that the controlling use is the principal use, and "a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong."  ARI 1(a).  Courts have interpreted the "class or kind" language of ARI 1 to be those goods that are "commercially fungible with the imported goods."  See Primal Lite, 182 F.3d at 1364.

[8] In relevant part, ARI 1 provides that

in the absence of special language or context which otherwise requires--

(a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use;
(b) a tariff classification controlled by the actual use to which the imported goods are put in the United States is satisfied only if such use is intended at the time of importation, the goods are so used and proof thereof is furnished within 3 years after the date the goods are entered.

ARI 1.

Brands, Inc. v. United States, 24 CIT 645, 651, 110 F. Supp. 2d 1020, 1026 (2000)).[9]

In the typical provision that is controlled by use, the word "use" or "used" appears in the language of the subheading.[10] In those provisions, the heading describes articles by the manner in which they are used as opposed to by name. See Clarendon Mktg., Inc. v. United States, 144 F.3d 1464, 1467 (Fed. Cir. 1998). The Court of Appeals' citation to StoreWALL indicates that where a tariff term does not include the word "use" it may nonetheless be controlled by use when the term itself (including the Section and Chapter Notes) or the Explanatory Notes indicates that, as a matter of law, the provision is controlled by use. See GRK II, 761 F.3d at 1359 n.7 (citing StoreWALL, 644 F.3d at 1365–67 (Dyk, J., concurring)).

---

[9] By stating that the ARIs "may" be reached, the Court has left open the possibility that the provisions should be considered provisions controlled by use, or alternatively that use may be implicated in deciding between the possible classifications. As the dissents in GRK II and GRK III note, the ARIs belong to a distinct interpretive framework. See GRK II, 761 F.3d at 1362 (Reyna, J., dissenting); GRK III, 773 F.3d at 1284–85, 1287 (Wallach, J., dissenting). The dissent in GRK II noted that

> it is improper to import a use limitation into an eo nomine provision unless the name of the good inherently suggests a type of use. A use provision, on the other hand, describes an article by its principal or actual use in the United States at the time of importation. Use provisions are governed by the U.S. Additional Rules of Interpretation ("ARI").

GRK II, 761 F.3d at 1362 (Reyna, J., dissenting) (internal citations omitted).

[10] See, e.g., Dependable Packaging Solutions, Inc. v. United States, 757 F.3d 1374, 1378 (Fed. Cir. 2014) (HTSUS headings 7010 covering "Carboys, bottles, flasks, jars, pots, vials, ampules and other containers, of glass, of a kind used for the conveyance or packing of goods . . ." and 7013 covering "Glassware of a kind used for table, kitchen, toilet, office, indoor decoration or similar purposes . . ." are principal use provisions); USR Optonix, Inc. v. United States, 29 CIT 229, 246, 362 F. Supp. 2d 1365, 1381 (2005) (HTSUS heading 3204 covering "Synthetic organic coloring matter . . . synthetic organic products of a kind used as fluorescent brightening agents or as luminophores . . ." is a tariff provision controlled by principal use).

In <u>StoreWALL</u>, the importer argued that its wall panels and hang up organizers should be classified as "parts" of unit furniture under HTSUS subheading 9403.90.50. <u>StoreWALL</u>, 644 F.3d at 1360.  The Court of Appeals agreed with the importer, reversing the U.S. Court of International Trade's decision, and the concurring judge wrote separately to explain that HTSUS heading 9403 which covers "Other furniture and parts thereof" is a provision controlled by use with respect to unit furniture.  The concurrence considered the Chapter Notes, as required by General Rule of Interpretation ("GRI") 1,[11] which provide that

---

[11] Customs classification is governed by the GRIs, which are a part of the HTSUS statute.  <u>BenQ Am. Corp. v. United States</u>, 646 F.3d 1371, 1376 (Fed. Cir. 2011).  Several of the GRIs are implicated by the cases discussed here, including:

> Classification of goods in the tariff schedule shall be governed by the following principles:
>
> 1.   . . . classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions:
> . . .
>
> 3.   When, by application of rule 2(b) or for any other reason, goods are, prima facie, classifiable under two or more headings, classification shall be effected as follows:
>     (a) The heading which provides the most specific description shall be preferred to headings providing a more general description.  However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.
>     (b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.
> . . .

(footnote continued)

> [t]he articles (other than parts) referred to in headings 9401 to 9403 are to be classified in those headings only if they are *designed for placing* on the floor or ground. The following are, however, to be classified in the above-mentioned headings even if they are *designed to be hung*, to be fixed to the wall or to stand one on the other: (a) Cupboards, bookcases, other shelved furniture and unit furniture....

See StoreWALL, 644 F.3d at 1365 (quoting Chapter 94 Notes, Note 2, HTSUS (2004)) (Dyk, J., concurring). The concurrence found the Chapter Notes describe unit furniture by the manner in which it is used. Id. The concurrence proceeded to consider the principal use of the merchandise at issue. See id. at 1366–67 (Dyk, J., concurring). The concurrence found the Explanatory Notes also implicated the design of the product by stating that "unit furniture" must be "'*designed to be hung*, to be *fixed* to the wall or to *stand* one on the other or side by side, *for holding* various objects or articles. . . .'" Id. at 1365 (quoting Explanatory Notes to Chapter 94 (2002)) (Dyk, J. concurring). The concurrence noted both the Chapter Notes and the Explanatory Notes not only referenced use, but made use the dispositive factor. Id. at 1364–65 (Dyk, J., concurring). The articulated use controlled what could or could not be classified within the tariff term because classification under the subheading "turns on the manner of use–whether the

---

6. For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to the above rules, on the understanding that only subheadings at the same level are comparable. For the purposes of this rule, the relative section, chapter and subchapter notes also apply, unless the context otherwise requires.

GRI 1, 3(a), 6.

items are primarily used with shelves or with hooks."[12]  Id. at 1366 (Dyk, J., concurring).

In the StoreWALL concurrence, which is referenced in GRK II, the Court of Appeals relies upon Processed Plastics for the notion that use may also be inherent in the meaning of a tariff term, making use the controlling factor in classifying the merchandise.[13]  Id. at 1365 (Dyk, J., concurring) (citing Processed Plastics, 473 F.3d at 1169–70).   In Processed Plastics, the importer challenged Customs' classification of children's backpacks (decorated with children's characters) and beach bags (filled with sand toys), claiming that they should be classified as other toys rather than as traveling bags, knapsacks and backpacks.  Processed Plastics, 473 F.3d at 1170.  The Court of Appeals agreed with Customs' classification of the merchandise and adopted the standard established in Minnetonka Brands, which held that "an object is a toy only if it is designed and used for amusement, diversion or play, rather than practicality."  See id. (citing Minnetonka Brands, 24 CIT at 651, 110 F. Supp. 2d at 1026).

Alternatively, the Court of Appeals noted the tariff term may suggest an intended use of a product, which may be considered in addition to its physical characteristics, such

---

[12] The concurrence in StoreWALL also cites to Orlando Food, 140 F.3d at 1441, for the proposition that use may be implicated in construing a tariff term where a specific use is inherent in the definition of an object.  Although it considers use in defining a tariff term, Orlando Food is not directly applicable here for several reasons.  The case was decided under GRI 3(a), not GRI 1. The Court of Appeals in Orlando Food concluded the merchandise was prima facie classifiable in both competing headings at issue.  In determining which was more specific, the Court of Appeals found that HTSUS heading 2103, "Sauces and preparations therefor," is a use provision insofar as it covers preparations for sauces and therefore more specific than the competing eo nomine provision because "[i]nherent in the term 'preparation' is the notion that the object involved is destined for a specific use."  Orlando Food, 140 F.3d at 1441.

[13] See, e.g., Hartz Mountain Corp. v. United States, 19 CIT 1149, 1150, 903 F. Supp. 57, 59 (1995) (holding that "[w]hen 'household' is used in conjunction with the term 'articles' in subheading 3924.90.50, HTSUS, a use provision is created.").

as its size, shape, and construction. [14]   See GRK II, 761 F.3d at 1358 (citing United States

v. Quon Quon Co., 46 C.C.P.A. 70, 73–74 (1959) ("under certain circumstances use may

be of 'paramount importance'" in understanding the commercial meaning of a term)). In

GRK II, the Court of Appeals relied on Quon Quon for the proposition that, in certain

circumstances, intended use should be considered in determining whether merchandise

is properly classified under an eo nomine provision.[15]   See id. at 1358, 1361 (citing Quon

Quon, 46 C.C.P.A. at 73–74).   The Court explained that

---

[14] The relevant terms for the framework laid out by the Court of Appeals for this case require: (i) consideration of actual or principle use if this court determines either provision is controlled by use; or (ii) consideration of intended use (i.e., how the item is designed and marketed to a typical user) if necessary to decide between two seemingly applicable eo nomine provisions.  To consider principal or actual use in a case where only intended use is implicated would be inconsistent with the governing interpretive framework.  Nothing in the Court of Appeals' analysis indicates principal or actual use are considerations in an eo nomine provision where intended use is implicated.

[15] The Court of Appeals also relied upon its previous decision in CamelBak Prods., LLC v. United States, which cited Quon Quon to support the proposition that the design and function of merchandise under an eo nomine provision may be an important aspect of the merchandise's identity.  GRK II, 761 F.3d at 1358 (citing CamelBak Prods., LLC v. United States, 649 F.3d 1361, 1368–69 (Fed. Cir. 2011)).  While CamelBak undeniably spoke of the "principal intended use of the product," it did so not in the context of an analysis under GRI 1, but rather, under GRI 3(b) to identify the essential character of the product.  CamelBak, 649 F.3d at 1369.  Thus, the case provides guidance where function and design are important considerations for determining the essential character of a product to decide under which of two headings the merchandise is prima facie classifiable, not for determining the meaning of a tariff term under GRI 1.  The Court of Appeals also invoked Casio, Inc. v. United States, 73 F.3d 1095 (Fed. Cir. 1996), but, similar to CamelBak, the issue in that case implicated use in a different manner than is presented here.  In Casio, the Court of Appeals considered whether the plaintiff's merchandise possessed "features substantially in excess of those within the common meaning of the term."  Id. at 1098.  The Court of Appeals looked to the primary design and function of the additional features and concluded that they did not remove the product from the eo nomine classification at issue.  Id.

    Finally, the Court of Appeals cites to Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1311 (Fed. Cir. 2003).  In Len-Ron, the Court of Appeals initially undertook an analysis to determine whether certain cosmetic bags are prima facie classifiable under the eo nomine provision for "vanity case," but then eschewed this analysis for one reserved for provisions that

(footnote continued)

> [t]he use of goods may be an important aspect of the distinction of certain eo nomine provisions, in particular, where, as here, the name of the provisions refers directly to the use of subject articles. This is why, even within the context of the HTSUS, we should not be "so trusting of our own notions of what things are as to be willing to ignore the purpose for which they were designed and made and the use to which they were actually put."

Id. at 1361 (quoting Quon Quon, 46 C.C.P.A. at 73).

In Quon Quon, the physical characteristics of the product implicated more than one tariff term. See Quon Quon, 46 C.C.P.A. at 72–73. The Court of Customs and Patent Appeals held that the tariff heading for baskets, while an eo nomine heading, connoted an article that not only had the shape and appearance of a basket, but also would be used as a basket. Id. The Court noted that, while the imported articles had the "size, shape, and construction of baskets," they were to be assembled with an iron base and only function as coffee table tops. Id. at 73–74. As a result, the Court found that it would be legal error to ignore the intended use of the product.[16] Id. at 72–73 ("To hold otherwise would logically require the trial court to rule out evidence of what things actually are every time the collector thinks an article, as he sees it, is specifically named in the tariff act.").

---

are controlled by use, stating that "for a handbag or case to be classified as a vanity case, containing, carrying, or organizing cosmetics must be its predominant use, rather than simply one possible use." Id.; see also GRK III, 773 F.3d at 1287 n.1 (Wallach, J., dissenting). It is unclear what principle from Len-Ron the Court of Appeals would have the court adhere to in its analysis of the eo nomine provisions at issue here. Len-Ron appeared to have determined that the term "'vanity case' was controlled by use but it did not declare the provision as such.

[16] Other cases have implicitly or explicitly considered design and intended use to analyze and define the scope of a tariff term. In two past decisions, the Court of Appeals eschewed a reading of the tariff term which would impose a utilitarian limitation on the festive articles provision and instead considered how various articles with holiday motifs were designed, marketed, and used. See Park B. Smith, Ltd. v. United States, 347 F.3d 922, 929 (Fed. Cir. 2003); Midwest of Canon Falls, Inc. v. United States, 122 F.3d 1423, 1429 (Fed. Cir. 1997).

Despite the fact that <u>Quon Quon</u> was decided under the predecessor to the HTSUS, the Tariff Schedules of the United States ("TSUS"), the Court of Appeals relied upon <u>Quon Quon</u> in <u>GRK II</u> for the proposition that the court would err by ignoring intended use in the unique case where the physical characteristics of certain merchandise may suggest multiple eo nomine classifications (<u>i.e.</u>, baskets and parts of furniture).[17] <u>GRK II</u>, 761 F.3d at 1358 (providing that "[i]n such a case, the court's inquiry includes the subject article's physical characteristics, as well as what features the article has for typical users, how it was designed and for what objectives, and how it is marketed.").

## II. The Meaning of "Other Wood Screws" and "Self-Tapping Screws"

The court defines the common and commercial meaning of "Other wood screws" and "Self-tapping screws" based upon the language of the headings, the Section and Chapter Notes, the Explanatory Notes, and the available lexicographic sources.   Neither tariff term at issue here is controlled by use such that the court must consider either actual use or principal use under ARI 1.   While the subheadings for both wood screws and the

---

[17] The dissents in both <u>GRK II</u> and <u>GRK III</u> criticized the majority's reliance on <u>Quon Quon</u>.   <u>See</u> <u>GRK II</u>, 761 F.3d at 1363 ("The majority thus fails to base its analysis in the current interpretative framework–the GRIs; it also provides an inaccurate and incomplete analysis of the now-defunct TSUS framework") (Reyna, J., dissenting); <u>GRK III</u>, 773 F.3d at 1286 (Wallach, J., dissenting) ("Thus, beyond its inapplicability to this case, <u>Quon Quon</u> stands only for the narrow proposition that, as a limited exception, use can sometimes be considered in the eo nomine analysis.").

<u>Quon Quon</u> suggests that where a product's physical characteristics arguably fall under two separate eo nomine provisions that it would be error to not consider intended use in defining the meaning of a tariff term.   <u>See</u> <u>Quon Quon</u>, 46 C.C.P.A. at 72–73.   Understandably, in most cases, the physical characteristics embodied in a tariff term will not overlap with the physical characteristics of another tariff term such that intended use of the tariff term will come into play. One can see how, as a conceptual matter, use is implicit in many eo nomine tariff terms.   To say something is a centerpiece, a walking stick, a tie, or a handbag suggests both certain physical characteristics and an assumption that the product will have been designed and marketed for that purpose.   In the ordinary case though, the physical characteristics embodied by the tariff terms for such merchandise will not overlap with another eo nomine provision.

self-tapping screws and the applicable Explanatory Notes implicate use to some degree, in neither case is use the controlling factor. However, here the physical characteristics of the putative tariff terms coincide to such an extent that the court must consider the intended use or design implicated by the tariff terms in addition to the physical characteristics that are part of the common and commercial meaning of the terms to distinguish between them. GRK II, 761 F.3d at 1360–61. The relevant sources indicate that a "wood screw" is a screw intended to be used and able to produce its own thread in wood, while "a self-tapping screw" is a screw made of hardened steel, intended to be used and able to cut its own thread through non-fibrous material.[18]

The language of the tariff terms at issue here does not indicate that either term is controlled by use. See, e.g., StoreWALL, 644 F.3d at 1365. The subheadings offered by each party are both in the same Section, Chapter and heading. The relevant portion of the HTSUS reads:

7318    Screws, bolts, nuts, coach screws, screw hooks, rivets, cotters, cotter pins, washers (including spring washers) and similar articles, of iron or steel:

--Threaded articles:
. . .

---

[18] Fibrous building materials, such as wood, are made up of cells that are long and thin. Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 19 at 2, Feb. 29, 2016, ECF No. 71-11. Non-fibrous building materials include metal, melamine, plastics, medium-density fiberboard, cement fiberboard, particle board (also known as oriented strand board, an engineered product consisting of wood chips glued together with a bonding agent), modern composite wood decking made of recycled plastics with wood chips mixed in, capstock decking, steel studs and other man-made composite materials. Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 2 at 75–81, Feb. 29, 2016, ECF No. 71-4; Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 6 ¶ 13(a), Feb. 29, 2016, ECF No. 71-5; Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 11 at 23–31, Ex. 12 at 20–29, Feb. 29, 2016, ECF No. 71-8.

| 7318.12.00 | Other wood screws . . . . . . . . . . 12.5% |
| | . . . |
| 7318.14 | Self-tapping screws: |
| 7318.14.10 | Having shanks or threads with a diameter of less than 6 mm . . . . . . . . . . . . . . . . . . . . . . 6.2% |

HTSUS heading 7318.

The phrase "Other wood screws" in HTSUS subheading 7318.12.00 suggests that screws classifiable in this subheading will be used in wood. However, nothing in the Section Notes, the Chapter Notes, or the heading indicates that classification within that subheading requires a certain principle or actual use. The phrase "Self-tapping screws" in HTSUS subheading 7318.14.10 also suggests screws classifiable in this heading will be used for tapping,[19] but nothing in the term suggests that a tapping use controls whether the merchandise is covered by the provision.[20] Moreover, there is nothing inherent in the terms "wood screws" or "self-tapping screws" that suggests classification is controlled by

---

[19] Female (internal) threads may be formed by cutting and/or by compressing material. Exs. Supp. Mot. Summ. J. Ex. 19 at 1, Feb. 29, 2016, ECF No. 71-11 ("Bohnhoff Suppl. Rep."). While the ANSI/ASME Standard reference both thread forming and thread cutting operations as tapping, it appears that the industry identifies tapping as thread cutting. Thus, the cutting of female threads is referred to as "tapping." Id. Although a special tool may be used to cut internal threads, screws that cut their own threads are called "thread-cutting screws," "tapping screws," or "self-tapping screws." Id. When screws are installed, those that push outward to a high degree on surrounding material (i.e. compress) are referred to as "thread-forming screws." Id. Thread forming screws are distinguished from thread cutting screws by "[t]he extent to which a screw is designed to form threads by compressing surrounding material versus forming threads by cutting surrounding material." Exs. Supp. Mot. Summ. J. Ex. 7 at 9, Feb. 29, 2016, ECF No. 71-11. Compression and cutting are not necessarily mutually exclusive, however, because thread forming screws cut material to a certain extent, and thread cutting screws involve some compression of material. Bohnhoff Suppl. Rep. 1.

[20] Neither the Section nor the Chapter Notes indicate that the respective subheadings are controlled by use.

use such that the court should declare either term a provision that is controlled by use, as a matter of law.  See GRK III, 773 F.3d at 1287 (Wallach, J., dissenting); see also Processed Plastics, 473 F.3d at 1169–70.  The concurring opinion in StoreWALL, which the Court of Appeals relied upon in GRK II, and the cases the concurring opinion in StoreWALL cites make clear that it is not enough for use to be implicated for a provision to be controlled by use, rather classification must "turn[] on the manner of use." StoreWALL, 644 F.3d at 1366 (Dyk, J., concurring).

The Explanatory Notes for these provisions also do not indicate a particular use that controls these provisions.[21]  They state:

> Screws for wood differ from bolts and screws for metal in that they are tapered and pointed, and they have a steeper cutting thread since they have to bite their own way into the material. Further, wood screws almost always have slotted or recessed heads and they are never used with nuts.
> Coach screws (screw spikes) are large wood screws with square or hexagonal unslotted heads.  They are used to fix railway lines to the sleepers and to assemble rafters and similar heavy woodwork.
> The heading includes self-tapping (Parker) screws; these resemble wood screws in that they have a slotted head and a cutting thread and are pointed or tapered at the end. They can therefore cut their own passage into thin sheets of metal, marble, slate, plastics, etc.

Explanatory Notes for HTSUS heading 7318.  The phrases "screws for wood" and "self-tapping (Parker) screws" in the Explanatory Notes each suggest a use for the screws, but the Explanatory Notes also offer physical characteristics for each type of screw and no language suggests that the subheadings are controlled by use.

---

[21] The Explanatory Notes, while not controlling, provide interpretive guidance.  E.T. Horn Co. v. United States, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003)).

Although neither provision is controlled by use, use may still be implicated in the court's interpretive analysis because, in limited circumstances, the intended use of the product may be implicated by the tariff terms.  See GRK II, 761 F.3d at 1360–61.  The court defines those terms relying upon its own understanding of the terms and may "consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." Carl Zeiss, 195 F.3d at 1379.

The tariff terms themselves indicate that self-tapping screws are not a form of wood screws.   The Explanatory Notes describe self-tapping screws as resembling wood screws.  See Explanatory Notes for HTSUS heading 7318.  The Explanatory Notes shed light on the difference between the two by clarifying that wood screws "bite their own way into the material" while self-tapping screws "cut their own passage into thin sheets of metal, marble, slate, plastics, etc."   See Explanatory Notes for HTSUS heading 7318. Nothing about these descriptions suggests they are both forms of wood screws.  Thus, these two subheadings are distinct and mutually exclusive.[22]

---

[22] Heading 7318 contains a subheading for "Coach screws," which the Explanatory Notes describe as a type of wood screw.  See Explanatory Notes for HTSUS heading 7318.  The Explanatory Notes do not describe self-tapping or Parker screws as a type of wood screw. The Explanatory Notes reinforce this point as they indicate that a self-tapping screw is similar to a wood screw while it describes the coach screw as a type of wood screw.  Explanatory Notes for HTSUS heading 7318.  Plaintiff's expert suggests that the categories have always been mutually exclusive and offers some insight into why the seemingly broad phrase "wood screw" was used:

> If indeed (1) those drafting the original version of the HTSUS saw categories of "other wood screws" and "self-tapping screws" as mutually exclusive, and (2) some self-tapping fastener can be used in wood, then the only conclusion that can be reached is that the category "other wood screws" was not a category developed

(footnote continued)

The parties have offered a number of dictionary definitions for the court to consider in defining the two competing provisions.  For wood screws, Defendant cites to definitions which emphasize a screw with a sharp thread that is used in wood.[23]  See Def. Br. 18–19.  All of the definitions cited by Defendant define a wood screw as being used in wood.  Certain definitions indicate that the screw is used for wood only,[24] while others indicate

---

for screws used in wood, but rather a category developed for a very specific type of non-self-tapping screw commonly referred to in the industry as a "wood screw". That these particular fasteners were called wood screws is not surprising given the fact that at the time of their development, they were used almost exclusively in wood.

Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 19 at 6, Feb. 29, 2016, ECF No. 71-11. Moreover, logically it would appear that in most cases two subheadings under the same heading in a chapter would necessarily be mutually exclusive of each other as each would be defined not only by its terms, but also by what it is not as indicated in the other subheading's terms.

[23] For example, Defendant defines a wood screw as a "pointed metal screw formed with a sharp thread of comparatively course pitch **for insertion in wood**." Def. Br. 18 (quoting Webster's Third New International Dictionary 2631 (Philip Babcock Gove, Ph. D. and Merriam-Webster Editorial Staff eds. 1993)).

[24] Defendant cites to the following definitions for wood screws which suggest that wood screws are only used in wood:

Wood Screw: a threaded fastener with a pointed shank, a slotted or recessed head, and a sharp tapered thread of relatively course pitch for use only in wood. McGraw-Hill Dictionary of Scientific and Technical Terms 2302 (6th ed. 2003).

Wood Screw: a metal fastener used for wood, usually having a flat, slotted head, a pointed shank, and a course thread.  Academic Press Dictionary of Science and Technology 2378 (Christopher Morris ed., 1992).

Def. Br. 18–19.  The court notes that its survey of other dictionaries also uncovered the following definitions suggesting the same:

Wood screw: [*Des Eng*] A threaded fastener with a pointed shank, a slotted or recessed head, and a sharp tapered thread of relatively coarse pitch for use only in wood.  McGraw-Hill Dictionary of Scientific and Technical Terms 2302 (6th ed. 2003)

(footnote continued)

that these screws may be used with wood or to join wood with metal or other resilient materials.[25]  Plaintiff does not provide any definitions for a wood screw.

---

Wood screw: *Mechanical Devices*, a metal fastener used for wood, usually having a flat, slotted head, a pointed shank, and a coarse thread.  Academic Press Dictionary of Science and Technology 2378 (Christopher Morris ed., 1992).

[25] Defendant cites to a definition defining a wood screw as "a metallic screw specifically adapted for fastening together parts of woodwork or wood and metal."  Def. Br. 18 (quoting Oxford English Dictionary 504 (2d ed. 1989)).  The court has uncovered at least one other dictionary definition suggesting that wood screws may be used in wood and other materials, which defines a wood screw as "a helically threaded metal fastener having a pointed end; forms its own mating thread when driven into wood or other resilient materials."  Dictionary of Architecture & Construction 1017 (Cyril. M. Harris ed., 3rd ed. 2000).

The dictionary definitions offered by Plaintiff for a self-tapping screw emphasize the screw's hardened material[26] and its ability to cut its own thread.[27]  GRK Br. 13–14. Defendant does not offer any dictionary definitions for self-tapping screws.

---

[26] Plaintiff offers the following definitions for a self-tapping screw that emphasize the screw's hardened material:

> Self-Tapping Screw: have a specially hardened thread that makes it possible for the screws to form their own internal thread in sheet metal and soft materials when driven into a hole that has been drilled, punched, or punched and reamed.  The use of self-tapping screws eliminates costly tapping operations and saves time in assembling parts.  McGraw-Hill Encyclopedia of Science and Technology 146 (9th ed. 2002).

> Self-Tapping Screw: a specially hardened screw used in wood and soft metals that self-cuts its own thread into the material being worked on.  Also, Tapping Screw, Sheet Metal Screw.  Academic Press Dictionary of Science and Technology 1951 (Christopher Morris ed., 1992).

GRK Br. 14.  According to Plaintiff, the latter definition provides that a self-tapping screw can be used in both wood and soft metals.  Id. at 14 n.4.

Other definitions uncovered by the court also emphasize the hardened nature of the self-tapping screw and the fact that it cuts its own thread:

> Self-tapping: a. *Mech.* Designating a hardened screw that will cut its own thread in a hole in metal that would otherwise need tapping.  14 The Oxford English Dictionary 932 (J.A. Simpson and J.S.C. Weiner eds., 2nd ed. 1989).

> Self-tapping screw: a hardened steel screw with a special, partially slotted shank which, as it is screwed into a plain hole, will cut or form its own threads.  Hugh Brooks, Encyclopedia of Building and Construction Terms 317 (1983).

> Self-tapping screw: [*Des Eng.*] A screw with a specially hardened thread that makes it possible for the screw to form its own internal thread in sheet metal and soft materials when driven into a hole.  Also known as sheet-metal screw; tapping screw.  McGraw-Hill Dictionary of Scientific and Technical Terms 1893 (6th ed. 2003).

> Self-tapping screw: *Mechanical Devices,* a specially hardened screw used in wood and soft metals that self-cuts its own threads into the material being worked on.  Also, TAPPING SCREW, SHEET METAL SCREW.  Academic Press Dictionary of Science and Technology 1951 (Christopher Morris ed., 1992).

(footnote continued)

The parties have also offered three industry standards published by ANSI/ASME for the court to consider in construing the meaning of the tariff terms: (i) Glossary of Terms for Mechanical Fasteners ASME B18.12-2001 ("ANSI/ASME Standard B18.12"); (ii) Wood Screws ANSI B18.6.1-1981 ("ANSI/ASME Standard B18.6.1"); (iii) Thread Forming and Thread Cutting Tapping Screws and Metallic Drive Screws (Inch Series) ASME B18.6.4-1998 ("ANSI/ASME Standard B18.6.4").[28]  Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Exs. 8–10, Feb. 29, 2016, ECF No. 71-7.

The terms in the ANSI/ASME Standards do not mirror those of the HTSUS subheadings.  In particular, ANSI/ASME Standard B18.12 and B18.6.4, when read in conjunction, define wood screws as a type of tapping screw, i.e., a thread forming tapping

---

Sheet-metal screw, tapping screw: a coarse-threaded tapered screw with a slotted head for driving with a screwdriver; used for fastening sheet metal and other materials, without a tapped hole and without a nut.  Dictionary of Architecture & Construction 826 (Cyril. M. Harris ed., 3rd ed. 2000).

[27] Plaintiff points to the following definition emphasizing the thread cutting aspect of self-tapping screws:

Tapping Screw: a hardened screw that cuts threads in the pieces it secures and that is used in materials which would otherwise require a separate tapping operation or the use of a nut.  Webster's Third New International Dictionary of the English Language, Unabridged 2340 (Philip Babcock Gove, Ph. D. and Merriam-Webster Editorial Staff eds. 1981).

GRK Br. 13.

[28] Defendant does not rely on the standard for wood screws under ANSI/ASME Standard B18.6.1 "because it is a limited product specification, not a definition, and thus cannot constitute the common meaning of the tariff term 'other wood screws.'"  Def. Resp. & Reply 11.  The court may consult any source that contains reliable information in defining the tariff terms.  Carl Zeiss, 195 F.3d at 1379.  Notwithstanding the fact that ANSI/ASME Standard B18.6.1 does not cover all wood screws, it is a reliable source that helps distinguish wood screws from self-tapping screws.

screw.[29]  ANSI/ASME Standard B18.12 defines a tapping screw as one with "a slotted,

recessed, or wrenching head and . . . designed to form or cut a mating thread in one or

more of the parts to be assembled."[30]   ANSI/ASME Standard B18.12 ¶ 3.1.2.22.

ANSI/ASME Standard B18.6.4 describes two types of tapping screws, thread forming and

thread cutting screws:

> 1.3.1 Thread Forming Tapping Screws. Thread forming tapping screws are
> generally for application in materials where large internal stresses are
> permissible, or desirable, to increase resistance to loosening.[31]

> 1.3.2 Thread Cutting Tapping Screws. Thread cutting tapping screws are
> generally for application in materials where disruptive internal stresses are
> undesirable or where excessive driving torques are encountered with thread
> forming screws.[32]

---

[29] Reading ANSI/ASME Standards B18.12 and B18.6.4 in isolation would not aid our inquiry as they do not categorize screws along the same lines as the HTSUS.

[30] HTSUS subheading 7318.14.10 refers to "Self-tapping screws." The relevant ANSI/ASME Standards speak of tapping screws and make no reference to self-tapping screws. A review of the relevant sources as well as expert testimony indicates that both phrases refer to screws that cut their own threads. The ANSI/ASME Standard refers to two types of tapping screws, thread forming and thread cutting. ANSI/ASME Standard B18.12. While Plaintiff and Defendant disagree as a factual matter regarding whether GRK's screws can bore (initiate) their own hole in all applications, none of the relevant sources require a self-tapping screw or a tapping screw to be able to bore its own hole. A self-tapping screw that bores its own hole is referred to as a self-drilling or self-piercing screw depending on whether it is a thread forming or thread cutting screw. See ANSI/ASME Standard B18.12; Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 7 at 9, Feb. 29, 2016, ECF No. 71-6; Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 19 at 1, 3, Feb. 29, 2016, ECF No. 71-11.

[31] The ANSI/ASME Standard provides that the different types of thread forming tapping screws are intended to be used in materials such as thin metal, resin impregnated plywood, asbestos compositions, nonferrous castings, and plastics. ANSI/ASME Standard B18.6.4 ¶ 1.3.1.

[32] The ANSI/ASME Standard provides that the different types of thread cutting tapping screws are intended to be used in materials such as aluminum, zinc, lead die castings, steel sheets and shapes, cast iron, brass, plastics, and asbestos. ANSI/ASME Standard B18.6.4 ¶ 1.3.2.

ANSI/ASME Standard B18.6.4 ¶¶ 1.3.1, 1.3.2.  Under the ANSI/ASME Standard, any

screw that either cuts or forms its own thread is a tapping screw.  Therefore, under the

ANSI/ASME Standards a wood screw would be a type of thread forming tapping screw.

Although the ANSI/AME Standards do not mirror the HTSUS subheadings, a

careful examination of the relevant standards aids in distinguishing between the HTSUS

subheadings at issue.  In particular, ANSI/ASME Standard B18.12 defines a wood screw

as:

> a thread forming screw having a slotted or recessed head, gimlet point, and
> a sharp crested, coarse pitch thread, and generally available with flat, oval,
> and round head styles. It is designed to produce a mating thread when
> assembled into wood or other resilient materials.

ANSI/ASME Standard B18.12 ¶ 3.1.2.30.  Further, ANSI/ASME Standard B18.6.4 states

that another type of tapping screw is the thread cutting tapping screw and is "generally

for application in materials where disruptive internal stresses are undesirable or where

excessive driving torques are encountered with thread forming screws."  ANSI/ASME

Standard B18.6.4 ¶ 1.3.2.  Therefore, while the ANSI/ASME Standards do not mirror the

language of the HTSUS subheadings, they do recognize a wood screw as a thread

forming screw and a tapping screw as a thread cutting screw used "where disruptive

internal stresses are undesirable or where excessive driving torques are encountered."

Id.

The amount of torque a screw is able to withstand is a defining characteristic of

tapping screws according to the ANSI/ASME Standard.  The ANSI/ASME Standard

provides that tapping screws must meet certain performance requirements.  ANSI/ASME

Standard B18.6.4 ¶¶ 2.6, 2.9.  Among these performance requirements, a tapping screw must satisfy a torsional strength test, which requires that a tapping screw be able to withstand a minimum level of torque.  ANSI/ASME Standard B18.6.4 ¶ 2.9.1.2.  The minimum torsional strength requirements for tapping screws vary depending on the type and size of the tapping screw.  See ANSI/ASME Standard B18.6.4 at Table 4.  The minimum requirements specified in the standard "shall apply to all types of carbon steel tapping screws only."  ANSI/ASME Standard B18.6.4 ¶ 2.9.1.  However, the ANSI/ASME Standard further provides that tapping screws made from other materials, including corrosion resistant steel, must also satisfy the torsional strength requirements of a tapping screw.[33]  See ANSI/ASME Standard B18.6.4 ¶ 2.9.1.

At first blush, the torsional requirements would seem to apply to both thread cutting and thread forming tapping screws.  However, the ANSI/ASME Standard for wood screws does not provide for a torsional strength requirement.  See ANSI/ASME Standard B18.6.1; Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 5 at 82–83, Feb. 29, 2016, ECF No. 71-5 ("Greenslade Dep.").  Therefore, the ANSI/ASME Standard indicates there are wood screws, which are thread forming screws, and there are thread cutting tapping screws, which have higher performance requirements than wood screws.  The language of the ANSI/ASME Standard for a wood screw tracks that of the HTSUS subheading

---

[33] The ANSI/ASME Standard does not specify the minimum torsional strength requirements for tapping screws made from materials other than carbon steel and leaves it to manufacturers and purchasers to determine the appropriate minimum requirement for these other materials. ANSI/ASME Standard B18.6.4 ¶ 2.9.1.

7318.12.00, suggesting that HTSUS subheading 7318.14.10 covers thread cutting tapping screws as that term is used under the ANSI/ASME Standard.

The court next considers intended use, i.e., how a typical user would use the product, and its impact on defining the tariff term. GRK II, 761 F.3d at 1358. The tariff terms and Explanatory Notes suggest that self-tapping screws are meant to be used to fasten a non-fibrous material (i.e., "sheets of metal, marble, slate, plastics") to some other material. See Explanatory Notes for HTSUS heading 7318. Nearly all dictionary definitions suggest that wood screws are intended to be used to affix wood to wood or to other fibrous materials. In contrast, the ANSI/ASME Standards indicate that tapping screws are intended to be used to fasten non-fibrous materials to either non-fibrous or fibrous material. ANSI/ASME Standard B18.6.4 ¶ 1.3.

The parties disagree as to whether the intended use of a self-tapping screw is limited to fastening non-fibrous material to other non-fibrous material or whether the self-tapping screw may also be intended to be used to fasten non-fibrous material to fibrous material (i.e., wood). Def. Br. 10, 22–23; Def. Resp. & Reply 4, 15; GRK Br. 36–37; GRK Resp. 29–30. Nothing in the relevant sources suggests that a self-tapping screw's intended use is only to fasten non-fibrous materials. Indeed, industry standards and dictionary definitions support the conclusion that the tariff term self-tapping screw includes screws that are intended to fasten non-fibrous materials to fibrous materials as well as to non-fibrous materials. See, e.g., Academic Press Dictionary of Science and Technology 1951 (Christopher Morris ed., 1992) (defining "Self-Tapping Screw as a specially hardened screw used in wood and soft metals that self-cuts its own thread into the

material being worked on.   Also, Tapping Screw, Sheet Metal Screw."); ANSI/ASME Standard 18.6.4 ¶¶ 1.3.1, 1.3.2.  Therefore, the intended use of a self-tapping screw is to affix a non-fibrous material to any other material.

In contrast, nearly all dictionary definitions cited by the parties for wood screws suggest that classifying merchandise as a wood screw requires that the screw be used to fasten wood to wood or other fibrous materials.  See,e.g., McGraw-Hill Dictionary of Scientific and Technical Terms 2302 (6th ed. 2003) (defining Wood Screw as a threaded fastener with a pointed shank, a slotted or recessed head, and a sharp tapered thread of relatively course pitch for use only in wood); Academic Press Dictionary of Science and Technology 2378 (Christopher Morris ed., 1992) (defining Wood Screw as a metal fastener used for wood, usually having a flat, slotted head, a pointed shank, and a course thread).  Nearly all other dictionaries consulted by the court suggest that wood screws are used only in wood.  See, e.g., McGraw-Hill Dictionary of Scientific and Technical Terms 2302 (6th ed. 2003) (defining Wood screw as "[*Des Eng*] A threaded fastener with a pointed shank, a slotted or recessed head, and a sharp tapered thread of relatively coarse pitch for use only in wood."); Academic Press Dictionary of Science and Technology 2378 (Christopher Morris ed., 1992) (defining Wood screw as "*Mechanical Devices*, a metal fastener used for wood, usually having a flat, slotted head, a pointed shank, and a coarse thread.").

To sum up, based on the words of the subheadings, the Explanatory Notes, the relevant standards, the dictionary definitions of the terms as well as the intended use, the court finds that (1) the common and commercial meaning of a wood screw is a screw that

forms its own thread by compressing surrounding material designed to fasten wood to wood or other fibrous material, and (2) the common and commercial meaning of a self-tapping screw is a specially hardened screw,[34] that meets minimum torsional strength requirements, that can cut away material to form a mating thread in non-fibrous material, and is designed to fasten non-fibrous materials, such as metal, to either fibrous or non-fibrous materials.

One authority offered in this case confirms these definitions of the tariff terms at issue.  As already discussed, in construing tariff terms "a court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources."  Carl Zeiss, 195 F.3d at 1378. Among the other reliable information sources, courts may also look to expert testimony, although such testimony is advisory, not binding, and the weight to be given to such testimony depends on various factors.  See United States v. Crosse & Blackwell, Inc., 22 C.C.P.A. 214, 217–218 (1934) (while opinions of witnesses as to common meanings of terms may properly be considered as advisory, the usual rule is to consult standard lexicographers to determine the common meaning of statutory words); United States v. John B. Stetson Co., 21 C.C.P.A. 3, 9 (1933) (a court may ascertain the common

---

[34] Defendant argues that Plaintiff cannot establish that wood screws are not case-hardened because the ANSI/ASME Standard provides that a wood screw may be case-hardened. Def. Br. 22.  The ANSI/ASME Standard states that a "[w]ood screw shall be supplied in steel, corrosion resistant steel, brass, aluminum alloy, or other materials as designated by the purchaser." ANSI/ASME Standard B18.6.1 ¶ 2.6.  While the ANSI/ASME Standard does not foreclose the possibility that a wood screw may be case-hardened, the material of the screw is only one of the physical characteristics that define a self-tapping screw.  A self-tapping screw must also meet minimum torsional requirements, be able to cut a mating thread in non-fibrous materials, and be able to fasten non-fibrous materials to other materials.

understanding of a tariff term by reference to works of standard lexicographers, scientific authorities, the testimony of witnesses, which is advisory only, or by other means available); Kahrs Int'l, Inc. v. United States, 35 CIT __, __, 791 F. Supp. 2d 1228, 1241 (2011) (opinions of expert witnesses pertaining to the common meaning of tariff terms may be considered to the extent they are supported, and not contracted, by reliable textual sources).

Here, both Plaintiff and Defendant have offered expert authorities' opinions relevant to the meaning of the tariff terms. See Greenslade Dep.; Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 7, Feb. 29, 2016, ECF No. 71-6 ("Bohnhoff Rep."); Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 19, Feb. 29, 2016, ECF No. 71-11 ("Bohnhoff Suppl. Rep.").   Dr. Bohnhoff's description of a self-tapping screw coincides with the court's definition.   He provides the following explanation of what constitutes a tapping or self-tapping screw:

> [I]t is important to understand that female (internal) threads are formed by cutting and/or by ***compressing*** material. The cutting of female threads is referred to as tapping.  A special tool used to cut internal threads is called a "tap".  Screws that cut their own threads are called *"thread-cutting screws"*, *"tapping screws"* or *"self-tapping screws"*. Tapping is an irreversible operation as once a material is cut, it remains cut.  Whereas some cutting operations remove material, other cuts (e.g. a single slit) may not.

Bohnhoff Suppl. Rep. 1.  This explanation indicates it is the ability to cut material, as opposed to the ability to compress material, which makes a screw a tapping screw or self-tapping screw.  Dr. Bohnhoff further clarifies that:

> Self-tapping should not be confused with self-drilling. Self-tapping is the cutting of female threads. This cutting may or may not result in the removal of material. Additionally, some self-tapping screws require a borehole (i.e., a pre-drilled hole). Self-tapping screws that require a borehole are not considered self-drilling.

Bohnhoff Suppl. Rep. 4. Thus, not all self-tapping screws are capable of tapping without need for a borehole, only a sub-class known as self-drilling screws.

Mr. Greenslade, Defendant's expert, states that self-tapping screws must meet minimum torsional strength requirements. Greenslade Dep. 81, 89. No other expert testimony contradicts this statement. Mr. Greenslade agrees that torsional strength determines the ability of the screw to resist being twisted into two pieces and that to increase torsional strength you need to have a harder screw. Id. Defendant's expert acknowledges that there is no such requirement for wood screws. See id. Therefore, expert testimony confirms that the common and commercial meaning of self-tapping screws are screws made of hardened steel, meeting minimum torsional strength requirements, capable of cutting their own thread, and intended to be used with at least one non-fibrous material.

Defendant's arguments that a self-tapping screw, by definition, is intended only for use in fastening non-fibrous materials to other non-fibrous materials is not borne out by the sources. Defendant's expert comments that a screw designed to pass through composite materials, even sheet metal, is still a wood screw if it is designed to anchor into wood in accordance with the ANSI/ASME definition of wood screw. Id. at 156–158. The ANSI/ASME definitions only address the ability of self-tapping screws to cut or form mating threads in whatever material they are being applied to. The Explanatory Notes,

although they speak of the ability of self-tapping screws to "cut their own passage into thin sheets of metal, marble, slate, plastics, etc.," do not indicate screws transform into wood screws when those materials are used in conjunction with wood.  Explanatory Notes for HTSUS heading 7318.  Defendant's interpretation is further belied by the fact that the Explanatory Notes explain the differences between screws for wood and those for metal based upon physical characteristics, not based upon the fact they are used in wood.  Id. No dictionary definition offered by either party or consulted by the court limits self-tapping screws to use in non-fibrous materials.

The court has considered use, and there is no authority to suggest that a self-tapping screw is limited to use with non-fibrous materials.  The Explanatory Notes specifically provide that self-tapping screws resemble wood screws, but with additional features that wood screws may not possess.  Explanatory Notes for HTSUS heading 7318.  Therefore, sharing features or applications with wood screws does not disqualify a screw from being a self-tapping screw nor does the fact that self-tapping screws may have features that make them also suitable to be used in wood.

### III. GRK's Steel Screw Fasteners

There is no genuine issue of a material fact and the court determines as a matter of law that GRK's screws are self-tapping screws classified under HTSUS subheading 7318.14.  The term self-tapping screw under HTSUS subheading 7318.14 refers to screws that are made of hardened steel, meet minimum torsional strength requirements, cut their own mating thread into non-fibrous materials, and are intended to be used to fasten non-fibrous materials to other materials.

It is uncontroverted that GRK's R4 and Trim Head screws are capable of cutting a mating thread in non-fibrous materials such as sheet metal, melamine, plastics, medium-density fiberboard, cement fiberboard, particle board (also known as oriented strand board, an engineered product consisting of wood chips glued together with a bonding agent), modern composite wood decking made of recycled plastics with wood chips mixed in, capstock decking, steel studs and other man-made composite materials.  GRK Facts ¶ 30; Def. Facts Resp. ¶ 30; Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 2 at 75–81, Feb. 29, 2016, ECF No. 71-4 ("Walther Dep."); Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 6 ¶ 13(a), Feb. 29, 2016, ECF No. 71-5 ("Walther Aff."); Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 11 at 23–31, Feb. 29, 2016, ECF No. 71-8 ("Ryan Dep."); Exs. Supp. Mot. Summ. J. Pl. GRK Canada, Ltd. Ex. 12 at 20–29, Feb. 29, 2016, ECF No. 71-8 ("Morlock Dep.").  It is also undisputed that the R4 and Trim Head screws are made of either case-hardened carbon steel or stainless steel.  Def. Facts ¶¶ 11, 12, 18, 19; GRK Facts Resp. ¶¶ 11, 12, 18, 19; GRK Facts ¶¶ 16–17; Def. Facts Resp. ¶¶ 16–17.  It is likewise undisputed that the R4 and Trim Head screws meet minimum torsional strength requirements.[35]   GRK Facts ¶¶ 22, 24; Def. Facts Resp. ¶¶ 22, 24. Therefore, GRK's screws satisfy the physical characteristics of a self-tapping screw.

---

[35] Defendant argues that wood screws, in particular wood screws that are covered under ANSI/ASME Standard B18.6.1 are also manufactured to meet minimum torsional strength requirements.  GRK Facts ¶ 36; Def. Facts Resp. ¶ 36.  The ANSI/ASME Standard provides that a wood screw "may be heat treated at the option of the purchaser or the manufacturer to develop adequate torsional strength for the intended application."  ANSI/ASME Standard B18.6.1 ¶ 2.6. Of course, in order for any screw to be merchantable it must have adequate torsional strength for

(footnote continued)

The intended use of GRK's screws supports their classification as self-tapping screws.  It is undisputed that the R4 and Trim Head screws are intended for fastening non-fibrous materials to other materials.  Def. Facts ¶ 35; GRK Facts Resp. ¶ 35; GRK Facts ¶¶ 30–31; Def. Facts Resp. ¶¶ 30–31.  GRK has offered testimony that GRK screws are recommended for and intended to be used in applications that require a screw that can cut its threads through non-fibrous materials.  Walther Dep. 75–81; Walther Aff. ¶ 13(a); Morlock Dep. 20–29; Ryan Dep. 23–31.  That same testimony indicates GRK's R4 and Trim Head screws can be used in non-fibrous materials such as sheet metal, melamine, plastics, medium-density fiberboard, cement fiberboard, particle board (also known as oriented strand board, an engineered product consisting of wood chips glued together with a bonding agent), modern composite wood decking made of recycled plastics with wood chips mixed in, capstock decking, steel studs, and other man-made composite materials.  Walther Dep. 75–81; Walther Aff. ¶ 13(a); Morlock Dep. 20–29; Ryan Dep. 23–31.  Defendant does not refute these capabilities, but rather cites GRK's sales documentation that certain features of the same screws make them suitable for a variety of uses in wood, such as wood decking, fine carpentry, or to mate certain non-wood materials like plastics or composite materials to wood.  Def. Facts Resp. ¶ 31 (citing Def. Br. Ex. F at 141).  That the screws are also capable of being used with wood or to

---

the applications the screw is well-suited for.  However, that does not mean that wood screws are required to meet a certain standardized minimum torsional strength requirement.  It is undisputed that GRK's screws meet a minimum requirement, and Defendant's expert states that there is no such requirement for wood screws.  See Greenslade Dep. 82–83.

fasten fibrous and non-fibrous materials does not undermine the intended use of the screws.

Further, additional available features of GRK's screws confirm their intended use with non-fibrous material. The Climatek coating, which is available for the case-hardened carbon steel screws, includes a water-based lubricant specifically intended to reduce the torque needed to drive the screws and allow them to be driven into "even very, very dense materials." GRK Br. 35 (citing Walther Dep. 59–61); GRK Facts ¶ 62; Def. Facts Resp. ¶ 62. That Climatek is intended to reduce torque signals GRK's screws are intended for applications that require high amounts of torque. Since only the standards for self-tapping screws require a minimum torsional strength, it follows that GRK's screws are specifically designed for use in dense materials requiring higher amounts of torque to drive the screws. Defendant does not dispute the availability of the Climatek coating on the case-hardened carbon steel screws or that the coating is a lubricant intended to reduce torque for driving. Def. Facts ¶¶ 11, 18; Def. Facts Resp. ¶ 62. In fact, Defendant concedes the purpose of Climatek coating is to reduce torque, stating that the Climatek coated case-hardened steel allows the screws to be anchored in pressure treated lumber, which is a hard, dense material that would require more torque for driving screws. Def. Br. 6, 7, 19, 20.

Both the R4 and RT screws also have features that are designed to help prevent the occurrence of mushrooming. The R4 screw possesses a self-countersinking head that is able to penetrate "hard, brittle, or thin plasticized surfaces veneered onto lumber or composite woods" without causing mushrooming. Def. Facts ¶ 24; GRK Facts Resp.

¶ 24.  The RT screws have been specifically designed to avoid mushrooming with its secondary reverse threading, which pulls any displaced material rising to the surface back into the screw hole.  GRK Facts ¶ 63; Def. Facts Resp. ¶ 63; <u>see also</u> Morlock Dep. 34–35; Ryan Dep. 34–35.  Without these features, non-fibrous material that the screw cuts and removes as it is driven would rise and create a mushroom on the surface.  GRK Facts ¶ 63; Def. Facts Resp. ¶ 63.  Mushrooming is not a concern for wood and fibrous material applications.    <u>See</u> GRK Facts ¶ 63; Def. Facts Resp. ¶ 63; <u>see also</u> Morlock Dep. 34–35; Ryan Dep. 34–35.

Likewise, the special points and threading patterns available on many of the screws facilitate the self-tapping function through dense non-fibrous material.  All the screws have a gimlet point.  GRK Facts ¶ 25; Def. Facts Resp. ¶ 25.  R4 screws that are 1¼ inches and longer and all RT and Fin/Trim screws have a Type 17 point.  Def. Facts ¶¶ 6, 14; GRK Facts Resp. ¶¶ 6, 14.  The Type 17 point "allows the screw to get started more easily and reduces the torque needed to drive the screw," GRK Facts ¶ 28; Def. Facts Resp. ¶ 28.  It is undisputed that GRK screws over 1¼ inches and longer also have W-Cut threading which act like a sawblade as it cuts through material.[36]  Def. Facts ¶¶ 8, 15; GRK Facts Resp. ¶¶ 8, 15.  None of these features are requirements for self-tapping

---

[36] That GRK's screws that are 1¼ inches or shorter do not have a Type 17 point, W-Cut, or CEE threading is a result of concerns about the fastening function of the screw, not their tapping function.  GRK's president explained that the reason these screws lack W-Cut threading is because "when you remove material from the thread by carving notches into it, then you also lose holding power, you don't have enough fully formed threads anymore in whatever you're going into with the screw to give it a lot of holding power, prevent it from pulling out."  Walther Dep. 20.  Likewise, GRK's president explained that there would be no purpose of putting CEE threads, which widen the screw hole, because doing so would "probably take away one or two of the actual holding threads and diminish the holding power again."  <u>Id.</u> at 66.

screws.  However, these features better enable the screws at issue to be used in materials such as "sheet metal, plastics, medium-density fiberboard, polyvinyl chloride (PVC) board, cement fiberboard, melamine, arborite, and other man-made composite materials," and thus the intended uses of GRK's screws support that they are self-tapping screws.  GRK Facts ¶ 30; Def. Facts Resp. ¶ 30.

Therefore, GRK's R4 and Trim Head screws are self-tapping screws.

## CONCLUSION

For the foregoing reasons, the steel screw fasteners at issue in this case are properly classifiable as "Self-tapping screws" under HTSUS subheading 7318.14.10. Therefore, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied.  Judgment will be entered accordingly.


　　　　　　　　　　　　　　　 /s/ Claire R. Kelly
　　　　　　　　　　　　　　　Claire R. Kelly, Judge

Dated: July 15, 2016
　　　　New York, New York